## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONY F., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO.   25-cv-555 |
| | : | |
| FRANK BISIGNANO, | : | |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

### MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                              **September 19, 2025**

Tony F. ("Plaintiff") brought this action seeking review of the Commissioner of Social Security Administration's ("SSA") decision denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f (the "Act"). This matter is before me for disposition upon consent of the parties. For the reasons set forth below, Plaintiff's Request for Review (ECF No. 7) is **DENIED**.

### I.     PROCEDURAL HISTORY

Plaintiff protectively filed the instant application for disability benefits on March 10, 2021, alleging disability beginning January 8, 2006, due to a visual impairment; antisocial personality disorder; borderline personality disorder; schizophrenia; bipolar disorder; post-traumatic stress disorder (PTSD); and an impulse control disorder. (R. 321). Plaintiff's application was denied at the initial level on October 1, 2021, (R. 104-13), and upon reconsideration on April 12, 2022. (R. 114-23). Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. 141-43). Plaintiff, represented by counsel, as well as a vocational expert (VE) testified at the initial May 16, 2023, administrative hearing. (R. 39-77).

At Plaintiff's request, the ALJ called a second hearing[1] on March 5, 2024, at which Plaintiff, who was represented by the same counsel, and a different VE testified.  (R. 78-103).  On March 18, 2024, the ALJ issued a decision unfavorable to Plaintiff.  (R. 7-31).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on December 20, 2024, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-6).

On February 1, 2025, Plaintiff filed a complaint in this Court.  (Compl., ECF No. 1).  On February 3, 2025, Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(c).  (Consent, ECF No. 3).  On May 20, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 7).  The Commissioner filed a Response on June 18, 2025.  (Resp., ECF No. 8).  Plaintiff filed a Reply on June 22, 2025.  (Reply, ECF No. 9).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on July 9, 1985, and was 35 years old on the date the application was filed.  (R. 24).  Plaintiff obtained his GED in lieu of graduating high school.  (R. 629).  Plaintiff has no past relevant work.[2]  (R. 54).

---

[1] Plaintiff requested a second hearing in order to further develop a separate claim.

[2] After a difficult upbringing, Plaintiff was arrested as a teenager and convicted of various crimes.  (Pl.'s Br., ECF No. 7, at 1-2; R. 630-31).  He was incarcerated from 2006 to 2020.  (R. 392-597).

A.    **Medical Evidence**

Plaintiff has experienced mental health issues and symptoms throughout his life and has been diagnosed with several disorders.  While incarcerated, Plaintiff was assessed with: anxiety disorder; bipolar II disorder; Asperger's disorder; adjustment disorder; mood disorder; anti-social personality disorder; disruptive conduct; psychosis; and paranoia.  (R. 2111, 2121, 2147-52). Plaintiff received ongoing psychiatric treatment for these issues throughout his time incarcerated and afterwards.  Plaintiff also has experienced left shoulder issues over the past several years.

On October 13, 2020, Plaintiff presented to Robert H. Hall, M.D., of Forensic Health Services of Philadelphia for a psychiatric evaluation.  (R. 2215-22, 2289-2301).  Plaintiff acknowledged a chronic history of sadness, depression with associated anhedonia, a generalized sense of helplessness, feelings of hopelessness, a fatalistic sense of his future, past trauma, feelings of guilt, thoughts about dying and suicide, and three suicide attempts while incarcerated. (R. 2216).  He denied any present intent to self-harm, however.  (*Id.*).  Dr. Hall noted that Plaintiff suffers from significant mood instability, which has been treated with various medication regimens.[3]  (*Id.*).  Nonetheless, although Plaintiff had recorded psychotic symptomatology in the past, Dr. Hall noted no symptoms of psychosis at the time of evaluation. (*Id.*).  Instead, he observed that Plaintiff: was moderately anxious during the evaluation; was at low risk for physical violence, substance abuse, or psychosis; presented as cooperative during the evaluation process; had a moderate lability noted with mild dysphoria and logical thought processes; lacked awareness of problems, consequences, and causes; and showed poor judgment.

---

[3]  Plaintiff listed Geodon, Risperdal, Seroquel, Sinequan, Depakote, and Paxil as some of the medications he had taken to treat his psychosis, depression, and other mental health issues. (R. 2217).  However, he stated that he was not taking any medications at the time of the evaluation.  (*Id.*).

(R. 2217-18).

Plaintiff treated with licensed professional counselor Stephen Pflugfelder, M.A., for his mental health issues after his release from prison.  (R. 2226-88).  Plaintiff often failed to attend his scheduled therapy sessions.  (R. 2229).  On May 16, 2023, Pflugfelder noted that Plaintiff "utilized treatment to work on his anxiety and stress related to his mental health.  He expresse[d] a strong desire to be an independent member of society; however, he struggle[d] with interpersonal interactions and maintaining employment due to his irritability and mistrust." (*Id.*).

On March 22, 2023, Pflugfelder provided an opinion regarding Plaintiff's capacity to engage in work-related activities.  (R. 2223-25).  Pflugfelder opined that: Plaintiff had mild limitations in his ability to understand and remember instructions; moderate limitations in his ability to carry out and apply instructions, make judgments on simple, work-related decisions, interact appropriately with co-workers and supervisors, and maintain concentration, persistence, or pace; and marked limitations in his ability to interact appropriately with the public and respond appropriately to usual work situations and changes in a work setting.  (R. 2223-24).  He also opined that Plaintiff was likely to be "off-task" 25% of the time or more and miss three or more days of work per month as a result of his medical impairments.  (R. 2224-25).  Pflugfelder cited the fact that Plaintiff presented with "significant impairment in interpersonal interactions," "labile mood," "frequent irritability," and "verbal[] aggressi[on]" in support of his conclusions. (R. 2224).  He stated that: Plaintiff had difficulty working with others; Plaintiff's depression "contribute[d] to his mood lability and irritability"; due to his extensive incarceration history, Plaintiff "struggle[d] with understanding basic societal norms and social interactions"; Plaintiff "[understood] everything through the lens of incarceration"; and Plaintiff "[s]truggle[d] with the lack of structure outside of prison."  (*Id.*).

On November 13, 2023, Plaintiff presented to Matthew Young, M.D., of Friends Hospital in Philadelphia for a crisis psychiatric evaluation. (R. 2421-41). Plaintiff was seeking a therapist or psychiatrist he could treat with. (R. 2422). Plaintiff presented with increased depression, reported he was not taking his medication,[4] stated that he just "wanted someone to talk to," and requested an outpatient referral. (*Id.*). He stated that his life had been "tough" recently as his grandmother had recently been diagnosed with dementia and he was acting as her caregiver. (*Id.*). Notwithstanding these troubles, Plaintiff denied experiencing any paranoia, mania, or inability to carry out activities of daily living (ADLs). (*Id.*). He admitted to hearing voices from a past acquaintance. (R. 2422-23). Dr. Young observed that Plaintiff: was alert, fully oriented, well-groomed, and cooperative; exhibited appropriate psychomotor activity with coherent speech and logical, linear, and organized thought processes; and had euthymic mood, fair insight and judgment, intact memory skills and abstract reasoning, average intellectual and adequate cognitive functioning, and grossly intact general knowledge. (R. 2423-24). Dr. Young opined that Plaintiff's mental impairments did not require inpatient hospitalization, but that Plaintiff would likely benefit from some sort of outpatient follow-up. (R. 2424).

On October 1, 2021, State agency psychological consultant Lori Anne Young found that there was insufficient evidence in the record to substantiate any psychiatric disorders that Plaintiff allegedly suffered and thus she could not evaluate the severity of Plaintiff's functional limitations. (R. 109-10).

On reconsideration on March 29, 2022, State agency psychological consultant Kerry Brace found that Plaintiff had the following severe impairments: depressive, bipolar and related

---

[4] Plaintiff stated that he had been prescribed Gedeon for his ongoing hallucinations, but that he discontinued use of the medication several times because it made him sleepy. (R. 2423). According to Plaintiff, he was able to discontinue use of Gedeon "without many issues." (*Id.*).

disorders; schizophrenia spectrum and other psychotic disorders; personality disorders; glaucoma; and anxiety and obsessive-compulsive disorders; trauma- and stressor-related disorders.  (R. 117.)  Based on these severe impairments, Brace determined that Plaintiff was moderately limited in his ability to: understand, remember, or apply information, including detailed instructions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; interact with others; concentrate, persist, or maintain pace; adapt or manage himself; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (R. 118, 120-21.)  Moreover, Brace determined that Plaintiff had marked limitations in his ability to interact appropriately with the general public.  (R. 121.)  Brace determined that Plaintiff was not significantly limited in his ability to: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; ask simple questions or request assistance; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (R. 120-21.)

On March 23, 2022, Plaintiff presented to State agency consultant and licensed psychiatrist Daniel Basch for a mental status evaluation.  (R. 627-40.)  In reviewing Plaintiff's medical history, Basch noted that Plaintiff: had seen "a couple" therapists throughout his life; had been placed in the mental health ward of the prison on numerous occasions throughout his incarceration; and was seeing a psychiatrist once per month at the time.  (R. 629.)  Plaintiff

reported: having difficulty falling asleep; loss of appetite; periods of dysphoric mood; irritability; loss of interest; fatigue; diminished sense of pleasure; periods of excessive apprehension; worry; restlessness; anxiety; an extensive history of interpersonal conflict; numerous traumas including being stabbed in the face and shot at on numerous occasions; nightmares; hypervigilance; and avoidance. (R. 630). Plaintiff also acknowledged that he had been diagnosed with bipolar disorder and schizophrenia, that he has heard voices intermittently in the past, and that he has difficulty concentrating, but noted that his medication regimen helps him with his symptoms. (R. 630). He denied any suicidal or homicidal ideation, intent, or plan. (R. 630).

Basch noted that Plaintiff's personal hygiene and grooming appeared satisfactory, eye contact was appropriate, and motor behavior was normal. (R. 631). Plaintiff's affect was mildly agitated, his mood was mildly irritable, his sensorium was clear, his attention and concentration were intact, he was oriented to person, place, and time, and his thought processes were coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia. (*Id.*). Basch noted that Plaintiff's memory skills were mildly impaired due to "focusing difficulties." (*Id.*). Lastly, Basch estimated Plaintiff's intellectual functioning to be borderline and noted that his general fund of information was appropriate. (*Id.*). Basch diagnosed Plaintiff with unspecified bipolar and related disorder; unspecified schizophrenia spectrum; unspecified anxiety; PTSD; antisocial personality disorder; and unspecified cannabis-related disorder. (R. 632).

Basch opined that Plaintiff had: mild limitations in his ability to understand and remember simple instructions; moderate limitations in his ability to carry out simple instructions, make judgments on simple work-related decisions, and understand and remember complex instructions; and marked limitations in his ability to carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes

in a routine work setting.  (R. 634-35).

Plaintiff presented to Christopher Kester, D.O., of Main Line Health in Penn Wynne, Pennsylvania, on April 14, 2023, complaining of left shoulder pain and instability.  (R. 2452-58). He reported initially dislocating his left shoulder approximately seven years prior during a physical altercation.  (R. 2453).  Since then, the same shoulder had dislocated roughly seven or eight times.  (*Id.*).  Each dislocation was successfully reduced.  (R. 2453, 2467, 2528, 2585-93). Dr. Kester noted that based on previous x-ray imaging, Plaintiff's shoulder displayed signs and symptoms consistent with recurrent anterior instability with Hill-Sachs lesion or fracture and anterior inferior glenoid rim fracture.  (*Id.*).  Dr. Kester observed that Plaintiff's left shoulder: had no erythema, edema, or other lesions; was mildly tender; and had five out of five strength in external and internal rotation.  (R. 2452-54).  Moreover, sensation to light tough was grossly intact throughout the left arm.  (*Id.*).  He recommended "conservative management" of the shoulder, including rest, ice, anti-inflammatory medication, activity modification, and physical therapy.  (R. 2453).

### B.    Nonmedical Evidence

The record also contains nonmedical evidence.  Plaintiff testified at the May 16, 2023, administrative hearing as to his work history, the severity of his medical issues, and how those medical issues affected his functional capacity.  (R. 54-67).  He testified that he had been incarcerated his entire adult life and therefore had almost no work experience.  (*Id.*).  When asked how people normally treated him, Plaintiff testified that he believed people were "out to get [him]" and that "nobody want[ed] to deal with [him]."  (R. 55).  He also stated that he hears the voices and whispers of other people in his head saying they do not want to deal with him and that they do not want him around.  (*Id.*).  As a child, Plaintiff usually kept to himself.  (*Id.*).  He never had any friends as a child or an adult, and while incarcerated, he was not allowed to have a

cellmate.  (R. 55-56).  Since being released from prison, Plaintiff testified that he lived in a variety of different places including his sister's house, his grandmother's house, "outside," and "around."  (R. 60-61).  He stated that his sister and his grandmother "conspire" against him and that both had kicked him out of their houses on separate occasions.  (R. 59-61).

Plaintiff has struggled with mental health issues his entire life, but he has consistently refused to follow his prescribed medication regimen.  (R. 56-57).  While incarcerated, he often refused to take his prescribed medication because it made him feel "tired" and "like a zombie." (R. 56).  He testified that he did not want to take this medication because he needed to be alert at all times.  (R. 56-57).  He also stated that he knew that people hated him, followed him, talked about him, set him up, and tried to control him.  (R. 57-58).

Plaintiff testified that he had been "tortured" by one of his mother's boyfriends.  (R. 63). He also acknowledged his diagnosis of anti-social personality disorder, attributing it to the fact that he has no friends and no significant personal relationships.  (R. 64-65).  He stated that he feels his best when he is alone and that he cannot be around people.  (R. 65).

Plaintiff confirmed several suicide attempts while incarcerated.  (R. 66).  He also testified to having aggressive thoughts and thought about hurting others, while incarcerated.  (*Id.*).  He stated that both while he was incarcerated and after, he feels as though he is "at war with everyone."  (R. 67).

Plaintiff also testified at the follow-up administrative hearing held on March 5, 2024.  (R. 87-94).  Plaintiff noted that he had completed some part-time work, but that he was never paid for that work and that he had been fired because his supervisor accused him of having a poor attitude, having poor work ethic, and not talking to any of his co-workers.  (R. 88).  He also confirmed that he does not get along with nor trust others, and that he blames others for this.  (R. 89).  Regarding his prescribed medication regimen, he testified that he does not like taking his

medication because it turns him into a "zombie."  (*Id.*).  He further specified that he needed to be alert and "on point" because other people are "trying to get" him.  (R. 89-90).  He noted that he used to participate in therapy sessions; however, Plaintiff believed that the therapist was also "trying to get" him because he attempted multiple times to place Plaintiff on a medication regimen to treat his psychosis.  (R. 93).

Regarding his shoulder injury, Plaintiff testified that his left shoulder was dislocated and that it hangs "in and out."  (R. 90).  He stated that he requires surgery whenever it pops out of its socket.  (*Id.*).

Dana Marmo, a VE, testified at the May 16, 2023, administrative hearing.  (R. 67-76).  When presented with a hypothetical individual of Plaintiff's age who could perform light work with certain restrictions, she testified that sufficient work would be available in the national economy for that individual.  (R. 68-69).  However, when presented with another hypothetical wherein the individual could deal with no changes in a routine work setting and could have no interaction with co-workers or the general public, Marmo testified that these additional restrictions would be work-preclusive.  (R. 69-70).

Vanessa Ennis, a VE, testified at the March 5, 2024, administrative hearing.  (R. 94-103).  When asked whether sufficient work was available in the national economy for an individual capable of performing light exertion work; frequently reaching overhead in all directions with the left, upper extremity; understanding, remembering, and carrying out simple instructions; having occasional interactions with supervisors or co-workers and no interactions with the general public; dealing with only occasional changes in a routine work setting; and incapable of performing work requiring a specific production rate, the VE testified that such work was available.  (R. 95-96).  She specified garment bagger, retail marker, and mail sorter as three positions available in sufficient numbers in the national economy.  (R. 96).  Further, she testified

that even if the restriction regarding contact with co-workers was reduced to "none," the jobs she specified would still remain available to the hypothetical individual.  (R. 97).

Plaintiff completed an adult function report on June 21, 2021.  (R. 327-36).  In that report, he noted that he lived with his family, that he cannot be around people he does not know, that he has trust issues, that he has PTSD, and that the medications he has been prescribed "for hearing the voices" in his head make him feel drowsy.  (R. 329).  He noted that he spends his days sitting in his room watching TV.  (R. 330).  According to Plaintiff, he can prepare certain basic meals for himself, he takes out the trash and cleans his own room, he does not have the energy to do any other house or yard work, and he is not able to pay bills, handle a savings account, or use a checkbook.  (R. 330-32).  He reported that his various medical conditions impact his ability to see, concentrate, understand, follow instructions, and get along with others. (R. 333).

Finally, Plaintiff also submitted records relating to his time incarcerated.  Those records indicated Plaintiff: was homicidal at times and experienced thoughts and urges to harm others; was suicidal at times; endorsed feelings of anger and irritability; gathered feces in a pile in his cell in order to hurl at others; heard voices in his head, including the "devil"; bragged about lighting another human being on fire; and generally displayed the signs and symptoms of psychosis and sociopathy.  (R. 924, 1684, 1734, 1745, 1916, 1926, 1943, 2136, 2168).

## III.    ALJ DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.    The claimant has not engaged in substantial gainful activity since March 10, 2021, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: Hill Sachs fracture in left shoulder with degenerative changes; depressive disorder; anxiety disorder; post-traumatic stress disorder (PTSD); bipolar disorder; adjustment disorder; substance use disorder (marijuana) (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: frequently reach overhead and all directions with the left; understand, remember and carry out simple instructions; occasional interaction with supervisors and no interaction with coworkers and the general public; deal with only occasional changes in routine work setting and cannot perform work requiring a specific production rate, such as assembly line work.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on July 9, 1985 and was 35 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a). (R. 16-

12

23).

10.    The claimant has not been under a disability, as defined in the Social Security

Act, since March 10, 2021, the date the application was filed (20 CFR

416.920(g)).

(R. 12-25).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 25).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to

the Commissioner that he cannot engage in substantial gainful activity because of a medically

determinable physical or mental impairment (MDI) that can be expected to result in death or that

has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. §

1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, then the
> Commissioner considers in the second step whether the claimant has
> a "severe impairment" that significantly limits his physical or
> mental ability to perform basic work activities.  If the claimant
> suffers a severe impairment, the third inquiry is whether, based on
> the medical evidence, the impairment meets the criteria of the
> impairment listed in the "listing of impairments," . . . which result
> in a presumption of disability, or whether the claimant retains the
> capacity to work.  If the impairment does not meet the criteria for a
> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform his past work.  If the
> claimant cannot perform his past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In his request for review, Plaintiff argues that the ALJ erred: 1) by failing to address Plaintiff's sociopathy, which was "unquestionably" an MDI; 2) in evaluating the medical opinion of Brace; 3) by relying upon Plaintiff's failure to adhere to prescribed treatment regimens as supportive of the overall RFC; and 4) in finding that Plaintiff had the RFC to perform any of the three jobs noted by VE Ennis.[5] (Pl.'s Br., ECF No. 7, at 11-29). For the following reasons, I disagree and deny Plaintiff's request.

---

[5] Plaintiff also argues wholesale that nearly all of the Commissioner's arguments constitute post hoc rationale. However, Plaintiff fails to support this contention by pointing to specific examples or arguments made by the Commissioner. Further, Plaintiff's contention is belied by the record for the reasons generally articulated in this memorandum opinion below.

### A.    The ALJ's Treatment of Plaintiff's Sociopathy

### 1.    The Parties' Arguments

Noting that he was "unquestionably diagnosed with antisocial personality disorder also referred to as sociopath[y]," Plaintiff contends that the ALJ was required to analyze the impact that his sociopathy had on his RFC.  (*Id.* at 9, 11-12 (citing SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996))).  According to Plaintiff, his sociopathy diagnosis precluded him from interacting with other people at all, including supervisors.  (*Id.* at 14-15).  He states that "the record shows that when Plaintiff is faced with stress or interacts with others, his behavior deteriorates."  (*Id.* at 17).  This purported inability to deal with stress or other people directly contradicts the RFC finding that the ALJ ultimately arrived at.  (*Id.* at 11-17).

In addition, Plaintiff argues that the ALJ compounded this error by misevaluating other evidence relating to Plaintiff's ability to interact with others.  (17-21).  Specifically, Plaintiff points to the ALJ's treatment of the opinions of both Basch and Pflugfelder, who each opined that Plaintiff had "marked" limitations in his ability to "respond[] appropriately to usual work situations and to changes in a routine work [setting]."  (*Id.* at 18 (citing R. 2223-35)).  Plaintiff claims that this limitation "obviously would include responding appropriate[ly] to the public, coworkers, and supervisors."  (*Id.*).  Plaintiff takes issue with the ALJ's determination that both of the aforementioned opinions were inconsistent with the rest of the record evidence.  (*Id.* at 18-21).

The Commissioner responds that despite Plaintiff's contentions, the ALJ recognized that the record "showed that [Plaintiff] has the ability to maintain normal thought processes, interact appropriately with medical providers, and when compliant with treatment, display appropriate behavior including excellent impulse control and normal mental functioning."  (Resp., ECF No. 8, at 1).  First, the Commissioner argues that Plaintiff's contention regarding the ALJ's failure to

discuss Plaintiff's sociopathy is a "red herring," as: 1) the regulations provide that only diagnoses established by the medical record will be considered; and 2) the core of disability analysis under the regulations is about functionality and the substance of a claimant's limitations, not the nomenclature used. (*Id.* at 6-8). As such, the ALJ considered medical evidence regarding Plaintiff's functional limitations related to his purported inability to interact with others, ultimately making the RFC determinations she did. (*Id.*).

Second, as for Plaintiff's contentions regarding the record evidence pertaining to his ability to interact with others, the Commissioner argues that the ALJ adequately considered all evidence on the issue and ultimately determined that, while Plaintiff had certain limitations, he was still able to interact with supervisors occasionally. (*Id.* at 10-11). In support of the ALJ's RFC determination, the Commissioner points to the opinion of Brace—who opined that Plaintiff had at most a moderate limitation concerning his ability to interact with others—and Plaintiff's failure to adhere to his treatment regimens. (*Id.* at 11-12).

Finally, the Commissioner notes that the ALJ accounted for Plaintiff's deficiencies in the RFC by determining he was unable to interact with co-workers or the public at all. (*Id.* at 12).

### 2.    Analysis

#### a.    Plaintiff's Ability to Interact with a Supervisor and Handle Routine Changes in a Work Setting

The ALJ alone is responsible for making disability determinations. 20 C.F.R. § 404.1527(e)(1). In making that determination, the ALJ is "free to accept some medical evidence and reject other evidence," so long as she "provides an explanation for discrediting the rejected evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014); 20 C.F.R. § 404.1527. An ALJ may also credit parts of an opinion without giving credit to the whole opinion so long as the rationale behind the decision is adequately articulated. *Byrd v. Comm'r of Soc. Sec.*, No. 23-

4957, 2024 WL 4631645, at *9 (E.D. Pa. Oct. 30, 2024); *cf. Diaz v. Comm'r of Soc. Sec.*, 577

F.3d 500, 505-06 (3d Cir. 2009) (the ALJ has the duty to adequately explain the evidence that

she rejects or to which she affords lesser weight).

The Act requires an ALJ to state the "reason or reasons upon which [a denial of benefits]

is based." 42 U.S.C. § 405(b)(1). An ALJ "may consider many factors" when determining the

reason or reasons for his or her decision, "yet base a decision on just one or two" factors.

*Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024). ALJs must "explain only

the dispositive reasons for their decisions, not everything else that they considered." *Id.* In other

words, ALJs "must always explain the reasons for their decisions. But that does not mean

always explaining all the factors." *Id.* The ALJ's opinion need only include "sufficient

development of the record and explanation of findings to permit meaningful review." *Jones v.

Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citation omitted). The Court reads the ALJ's

decision "as a whole" to determine whether the record was sufficiently developed. *Id.*

A claimant's *functionality* is the appropriate lens through which to view disability

analysis. *See Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (noting that a claimant's

functionality, rather than a diagnosis itself, is the appropriate focus of the disability analysis). "A

diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act." *Id.*

"Rather, a claimant must show that the impairment resulted in disabling limitations." *Id.* (citing

*Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir.1990)).

Under the regulations, the ALJ must determine if the claimant has a medically

determinable impairment that is severe or if there is a combination of impairments that are

severe. 20 C.F.R. § 404.1520(c); *Rolon-Torres v. Kijakazi*, No. 22-cv-00223, 2023 WL

2244684, at *3 (E.D. Pa. Feb. 27, 2023). When considering the severity of a mental impairment,

an ALJ must assess the degree of impairment in four areas of mental function: understanding,

remembering, and applying information; concentrating, persisting, and maintaining pace

("CPP"); interacting with others; and adapting or managing oneself.  20 C.F.R. §

404.1520a(c)(3).  Based on this initial assessment, the ALJ then must determine how, if at all, a

claimant's impairment in any of those four areas affects a claimant's ultimate RFC.  *See Hess v.*

*Comm'r of Soc. Sec.*, 931 F.3d 198, 211 (3d Cir. 2019) (an RFC limiting a claimant to "jobs

requiring understanding, remembering, and carrying out only simple instructions and making

only simple-work related decisions" may accurately reflect a claimant's moderate difficulties in

CPP "as long as the ALJ offers a 'valid explanation'").

Here, Plaintiff contends that his sociopathy prevented him from interacting with others,

including any potential supervisors.  Therefore, regardless of whether the ALJ expressly noted a

diagnosis of sociopathy, the relevant question is whether the ALJ considered all of the functional

limitations that Plaintiff's mental impairments presented—including his ability to interact with

others—when fashioning his RFC.  *Phillips*, 91 F. App'x at 780.  After review of the ALJ's

decision, it is clear that she did so.

The ALJ surveyed the relevant medical opinions and record evidence relating to

Plaintiff's mental RFC, ultimately determining that he had a moderate limitation in interacting

with others.  (R. 15).  Moreover, the ALJ found that although he could not have any contact with

the public or co-workers, he was able to occasionally interact with a supervisor.  (R. 17).  The

ALJ noted that the limitation pertaining to Plaintiff's interaction with the public, co-workers, and

a supervisor was "based primarily on evidence from [Plaintiff's] outpatient mental health

treatment and generally normal mental status examination findings, with some evidence of

deficits in social functioning and reduced cognitive abilities at the consultative examination."

(R. 18 (citing R. 627-40, 2215-22, 2226-2302)).

In support of these findings generally, the ALJ noted that Plaintiff: 1) has significant

external stressors, including difficulties with family members and housing; 2) reported that he

struggles to get along with others, preferring to isolate himself, but that he  can use public

transportation; 3) had generally normal mental status examinations, with appropriate dress and

appearance, appropriate interview behavior, normal speech, euthymic mood, congruent affect,

excellent insight and judgment, excellent impulse control, unremarkable thought process,

appropriate thought content, unremarkable perception, and intact functional status; 4) had a poor

manner of relating and poor insight and judgment at his consultative examination, but was

otherwise cooperative with normal speech and thought process, only mildly agitated affect, and

mildly irritable mood; 5) had a clinical mental status examination within normal limits with no

significant findings, despite subjective complaints of hallucinations and other symptoms; 6)

reported in November 2023 that he was living with his grandmother, who had been diagnosed

with dementia, and that he was her primary caregiver; 7) admitted at that time that he was not

taking his prescribed medication (Geodon) and had discontinued it a few months prior without

any issues; 8) and was referred to continued outpatient psychiatry, with no medical need for

more intensive treatment, but often failed to attend his scheduled outpatient therapy

appointments.  (R. 15-19).  Moreover, the ALJ found that:

> [Plaintiff's] general ability to maintain normal thought processes
> and interact appropriately with his outpatient providers supports a
> finding that he remains capable of occasional interaction with
> supervisors.  However, his hesitation toward social interaction with
> a preference to isolate himself, and his history of incarceration for
> most of his adult life as a result of a violent crime, support a
> finding that he should have no interaction with coworkers and the
> general public.

(R. 19 (citing R. 2215-22, 2226-88)).

The ALJ was entitled to make the above findings and adequately supported them with the

highlighted evidence.  *See* 42 U.S.C. § 405(b)(1) (the Act requires the ALJ to state the reasons

upon which her disability decision is based); 20 C.F.R. § 404.1527 (the ALJ is responsible for making the disability determination); *Zirnsak*, 777 F.3d at 614 (the ALJ is free to accept or reject record evidence, so long as she explains her rationale for doing so); *Zaborowski*, 115 F.4th at 639 (ALJs must "explain only the dispositive reasons for their decisions, not everything else that they considered"); *cf. Daniel B. v. O'Malley*, No. 23-cv-1939, 2024 WL 3086250 at *5 (E.D. Pa. June 20, 2024) ("An ALJ may disregard a claimant's subjective complaints when contrary evidence exists in the record.") (citing *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993)).

Therefore, the ALJ did not err in finding that Plaintiff maintains the ability to occasionally interact with a supervisor and handle occasional changes in routine work setting.

### b.    The ALJ's Treatment of the Opinions of Basch and Pflugfelder

Plaintiff also argues under this claim that the ALJ erred in rejecting the opinions of Basch and Pflugfelder that Plaintiff had marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting. The ALJ was entitled to reject those opinions, and did so. An ALJ is free to accept or reject record evidence, so long as she explains her rationale for doing so. *Zirnsak*, 777 F. 3d at 614; *see also Mason*, 994 F.2d at 1066 (holding that when confronted with several medical opinions, the ALJ can choose to credit certain opinions over others as long as she does not "reject evidence for no reason or for the wrong reason"). The ALJ must evaluate the persuasiveness of the source using multiple factors, the most important being supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). Under the regulations, "supportability" is the extent that a medical source presents "relevant . . . objective medical evidence and . . . supporting explanations," and "consistency" is the extent to which the medical opinion is consistent with evidence from other medical and nonmedical sources. *Id.* at § 404.1520c(c)(1)-(2).

In rejecting Basch's opinion, the ALJ stated that it was not well-supported or consistent with the updated evidence in the record from other sources. (R. 22). Regarding supportability, she highlighted that on mental status examination Basch noted that Plaintiff was cooperative with normal speech and thought process, intact attention and concentration, and only mildly agitated affect, irritable mood, and impaired memory skills, despite his otherwise poor manner of relating, insight, and judgment. (*Id.* (citing R. 631)). Further, while Basch estimated his intellectual functioning as borderline, he did not conduct formal intelligence testing. (*Id.* (citing R. 631)). Thus, the ALJ determined that "Basch's at most mildly abnormal examination findings [were] not supportive of his opinion for marked limitations in carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with the public, coworkers, and supervisors, and responding appropriately to usual work situations and to changes in a routine work setting." (*Id.* (citing R. 634)). The ALJ found that Basch's opinion not consistent with the record because notwithstanding only "sporadic" attendance at therapy sessions, Plaintiff's treatment helped him in "increasing healthy coping skills, building resiliency, and decreasing his potential risk for recidivism." (*Id.* (citing R. 2285)). Further:

> [d]espite external stressors, and preferring to isolate himself [Plaintiff's] mental status examinations were generally within normal limits when he did attend sessions, including appropriate dress and appearance, appropriate interview behavior, normal speech, euthymic mood, congruent affect, excellent insight and judgment, excellent impulse control, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status.

(*Id.* (citing R. 2234, 2240-43, 2250, 2253, 2255, 2257, 2261, 2265, 2269, 2276, 2278-79, 2283)). Finally, the ALJ noted that Pflugfelder opined that Plaintiff had only moderate limitations in his ability to interact with co-workers or a supervisor. (*Id.* (citing R. 2223-25)). Therefore, the ALJ determined that Basch's opinion was not consistent with the record evidence. (*Id.*).

Like Basch, Pflugfelder also opined that Plaintiff had marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting, but the ALJ found that this opinion was not well-supported by the evidence upon which it relied or consistent with the other evidence in the record. (*Id.* at 23). Instead, she concluded that Plaintiff's ability to maintain normal thought processes and interact appropriately with his outpatient providers supported a finding that he remains capable of occasional interaction with supervisors. (*Id.*). In doing so, she also acknowledged that the record evidence demonstrated that Plaintiff could not interact with coworkers and the general public. (*Id.* (citing R. 2216, 2218-19, 2234, 2241-43, 2255, 2278-79)).

Based on this record, it is clear that the ALJ adequately explained why she rejected both opinions when she highlighted the medical notes demonstrating Plaintiff's ability to interact with other providers, as well as Pflugfelder's own opinion that Plaintiff had only moderate limitations in his ability to interact with a supervisor—and these findings and conclusions were supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Zaborowski*, 115 F.4th at 639; *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Hartranft*, 181 F.3d at 360 (a district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards).

Accordingly, I find that the ALJ did not err in her evaluation of the opinions of Basch and Pflugfelder.

**B.      The ALJ's Treatment of Brace's Opinion**

**1.      The Parties' Arguments**

Next, Plaintiff raises the ALJ's treatment of Brace's opinion as another purported error. (Pl.'s Br., ECF No. 7, at 21-22). He highlights that Brace opined that Plaintiff has a moderate limitation in his ability to respond appropriately to criticism from his supervisor and argues that

the ALJ never addressed this piece of evidence. (*Id.* at 21-22 (citing R. 121)). Accordingly, "[s]ince the ALJ never explained why she did not include in her RFC finding a mandatory component of unskilled work (how Plaintiff would *respond to criticism* from his boss), her decision must fail." (*Id.* (emphasis in original)). Plaintiff maintains that this purported omission was reversible error as the VE testified that not being able to appropriately respond to supervisor criticism is a work-preclusive limitation.[6] (*Id.* (citing R. 17)).

The Commissioner responds that the ALJ's treatment of Brace's opinion was not error, as there is no requirement to articulate work-related functions such as the ability to respond to others, or to address them in an RFC assessment. (Resp., ECF No. 8, at 9 (citing 20 C.F.R. § 416.945(c))). Therefore, the ALJ's discussion of Brace's opinion was sufficient. (*Id.* at 9-10). Alternatively, the Commissioner contends that read in context, the ALJ's decision illustrates that she did in fact consider the entirety of Brace's opinion (including that Plaintiff cannot respond appropriately to criticism from a supervisor), accepted the portion of the opinion that Plaintiff had moderate limitations in interacting with a supervisor, but rejected the portion regarding Plaintiff's ability to respond appropriately. (*Id.* at 9-11 (citing R. 15, 17)).

---

[6] Plaintiff also raises as a sub-issue the fact that the ALJ never mentioned that Brace's opinion was two years old at the time of evaluation and therefore "stale." (Pl.'s Br., ECF No. 7, at 21). This contention is directly at odds with Plaintiff's primary contention that the ALJ should have accepted Brace's opinion, and Plaintiff will not be heard to both "approbate and reprobate" on this point. *Zamma Canada Ltd. v. Zamma Corp.*, No. 3:20cv353-HEH, 2020 WL 7083940, at *6 (E.D. Va. Dec. 3, 2020) ("Approbate and reprobate is a distinct legal concept precluding litigants from taking inconsistent positions to the degree that the litigant invites error and takes advantage of the inconsistency.") (citing *Matthews v. Matthews*, 675 S.E.2d 157, 160 (Va. 2009)); *see also Kaiser v. Standard Oil Co. of New Jersey*, 89 F.2d 58, 59 (5th Cir. 1937).

Moreover, courts have permitted reliance on records as old as those at issue here. *See, e.g., Morales v. Apfel*, 225 F.3d 310, 312-13 (3d Cir. 2000) (upholding a 1997 ALJ decision based on records from 1989 through 1994); *Hartranft*, 181 F.3d at 360-61 (finding substantial evidence where the ALJ relied on six-year-old medical records). Therefore, any argument that the medical records in this case were "stale" would fail.

2.      **Analysis**

As noted above, an ALJ is free to accept or reject record evidence, so long as she explains her rationale for doing so.  *Zirnsak*, 777 F. 3d at 614.  ALJs must "explain only the dispositive reasons for their decisions, not everything else that they considered."  *Zaborowski*, 115 F.4th at 639.  The ALJ's opinion need only include "sufficient development of the record and explanation of findings to permit meaningful review," and the Court reads the ALJ's decision "as a whole" to determine whether the record was sufficiently developed.  *Jones*, 364 F.3d at 505.

Here, the ALJ's decision illustrates that she considered the whole of Brace's opinion, including the portion regarding Plaintiff's ability to appropriately respond to criticism, but ultimately determined that Plaintiff could handle the demands of light work with certain restrictions.  (R. 17-25).  The ALJ found Brace's opinion partially persuasive.  (R. 21).  She agreed that the record supported his opinion that Plaintiff had moderate limitations in his ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage himself; understand, remember, or carry out detailed instructions; maintain concentration and complete a workday and workweek; and interact with supervisors and coworkers.  (*Id.*).  Further, she agreed that Plaintiff had marked limitations in his ability to interact with the general public.  (*Id.*).  However, the ALJ found unpersuasive the remainder of the "social functioning limit[ations]" Brace assessed, noting that they were inconsistent with the rest of the record evidence as Plaintiff had normal mental status examinations and demonstrated normal thought processes during multiple examinations.  (*Id.*).

In addition, though Plaintiff reported struggling to get along with others, the ALJ juxtaposed this testimony with other record evidence that indicated Plaintiff had the capability to interact appropriately with others occasionally, stating in pertinent part:

He reports that he struggles to get along with others, preferring to isolate himself. Nonetheless, [Plaintiff's] mental status examinations are generally within normal limits, including appropriate dress and appearance, appropriate interview behavior, normal speech, euthymic mood, congruent affect, excellent insight and judgment, excellent impulse control, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status.

(*Id.* at 19 (citations omitted)). Moreover, the ALJ went on to conclude:

[Plaintiff's] general ability to maintain normal thought processes and interact appropriately with his outpatient providers supports a finding that he remains capable of occasional interaction with supervisors. However, his hesitation toward social interaction with a preference to isolate himself, and his history of incarceration for most of his adult life as a result of a violent crime, support a finding that he should have no interaction with coworkers and the general public.

(*Id.* (citations omitted)). Finally, the ALJ found that Plaintiff's mental status was within normal limits, and that he could therefore understand, remember and carry out simple instructions as well as deal with occasional changes in routine work setting. (R. 19-20).

The above demonstrates that the ALJ considered the record evidence pertaining to Plaintiff's ability to respond appropriately to a supervisor and ultimately determined that, though limited, Plaintiff had normal mental function, had shown the ability to interact with others in certain settings, and therefore had the ability to interact with a supervisor (which included the ability to respond appropriately to criticism). Though Plaintiff may disagree with this rationale, the ALJ is ultimately responsible for making factual findings and determining a claimant's RFC, and so long as the ALJ's rationale is supported by substantial evidence, her decision must stand. *See* 20 C.F.R. § 404.1527(e)(1); *Hilty v. Berryhill*, No. 17-1585, 2019 WL 950334, at *4 (W.D. Pa. Feb. 27, 2019) ("Plaintiff's mere disagreement with the ALJ's assessment is of no moment, where, as here, substantial evidence supports the ALJ's conclusions."); *Izzo v. Comm'r of Soc.*

*Sec.*, 186 F. App'x 280, 284 (3d Cir. 2006) ("Where evidence in the record is susceptible to more

than one rational interpretation, [the Court] must accept the Commissioner's conclusions.");

*Hartranft*, 181 F.3d at 360; *Jones*, 364 F.3d at 505; *Zirnsak*, 777 F. 3d at 614; *Zaborowski*, 115

F.4th at 639.

Accordingly, I find that the ALJ did not err in finding Brace's opinion only partially

persuasive.

### C.    Plaintiff's Failure to Adhere to Prescribed Treatment Regimens

### 1.    The Parties' Arguments

Plaintiff next argues that the ALJ erred when she relied, in part, on Plaintiff's failure to

adhere to certain prescribed treatments to support the RFC determination.  Plaintiff

acknowledges that in certain circumstances, the failure to adhere to prescribed treatments may be

relied upon as evidence of the absence of disability.  (Pl.'s Br., ECF No. 7, at 22-24).  However,

citing to SSR 18-3p, 2018 WL 4945641 (Oct. 2, 2018), and SSR 16-3p, 2016 WL 1119029, (Oct.

25, 2017), Plaintiff contends that such a finding may not be made "unless the ALJ first uncovers

whether the claimant has any justified reasons for" such failure.  (*Id.* at 24).  Plaintiff argues that

"[u]ltimately, the record shows here that Plaintiff simply cannot [follow through with] treatment

[due to] his overreactive, homicidal, paranoid, and angry nature."  (*Id.*).

The Commissioner responds that the ALJ did in fact consider each of the reasons set

forth by Plaintiff and ultimately decided not to credit them.  (Resp., ECF No. 8, at 12).

According to the Commissioner, this determination fell within the ALJ's prerogative as

factfinder.  (*Id.*).

### 2.    Analysis

"There is no question that a claimant's compliance or non-compliance with his or her

recommended treatment is a valid factor to consider in evaluating the credibility of the

claimant's statements [regarding the existence of disability]." *Little v. Kijakazi*, No. 20-126-E, 2021 WL 4295716, *1 n.3 (W.D. Pa. Sep. 21, 2021); *see also* SSR 16-3p, 2016 WL 1119029, at *8-9; *Middleton v. Colvin*, No. 15-1419, 2015 WL 13738770, at *14 n.25 (E.D. Pa. Dec. 8, 2015), *report and recommendation adopted*, No. 2:15-CV-1419, 2016 WL 244930 (E.D. Pa. Jan. 21, 2016).  Therefore, "there is nothing inherently wrong with the ALJ's reliance on this factor in making [her] findings as to the consistency of Plaintiff's statements." *Id.*  However, Plaintiff contends that the ALJ failed to account for other possible explanations for his non-compliance with his medication and outpatient appointments, rendering the credibility analysis flawed.  (Pl.'s Br., ECF No. 7, at 23-25).

Plaintiff is correct that an ALJ must not "find an individual's symptoms inconsistent with the evidence in the record on [the basis of non-compliance] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."  SSR 16-3p, 2016 WL 1119029, at *8; *see also Fahy v. Astrue*, No. 06-CV-366, 2008 WL 2550594, at *7 (E.D. Pa. June 26, 2008).  Valid alternative reasons can include where a claimant's mental impairments prevent him or her from understanding "the appropriate treatment for or the need for consistent treatment of his or her impairment" or from being "aware that he or she has a disorder that requires treatment." *Id.*  at *9.  Plaintiff suggests that the nature of his mental conditions accounts for his non-compliance and constitutes sufficient reason to preclude the ALJ from holding his non-compliance against him.  (Pl.'s Br., ECF No. 7, at 23-25).  However, upon closer inspection, Plaintiff's non-compliance was not in fact the reason that the ALJ discounted his statements regarding the intensity and persistence of his symptoms.

Though the ALJ noted that Plaintiff repeatedly discontinued his medication regimen and only sporadically attended appointments, she highlighted that notwithstanding his noncompliance with treatment Plaintiff's mental status examinations "were generally within

normal limits when he did attend sessions, including appropriate dress and appearance, appropriate interview behavior, normal speech, euthymic mood, congruent affect, excellent insight and judgment, excellent impulse control, intact memory, good attention and concentration, unremarkable thought process, appropriate thought content, unremarkable perception, and intact functional status." (R. 14, 19 (citing 2226-2302)). Moreover, Plaintiff reported that after choosing to discontinue his medication regimen, he did not experience any significant issues. (R. 2422 (Plaintiff "denies troubles with sleep, appetite, paranoia, mania, or inability to carry out ADLs" after discontinuing medication)). The ALJ therefore did not purport to rely on Plaintiff's non-compliance, but instead found that whether he was complying with treatment or not, he simply did not exhibit sufficiently severe symptoms for her to create an RFC restricted enough to render him disabled. Where the ALJ has articulated reasons supporting a credibility determination, that determination is afforded significant deference. *See Horodenski v. Comm'r of Soc. Sec.*, 215 Fed. App'x. 183, 188-89 (3d Cir. 2007)

Accordingly, Plaintiff's contention on this point fails.

**D.    Plaintiff's Ability to Perform Vocational Activities**

**1.    The Parties' Arguments**

Finally, Plaintiff argues that the record evidence did not support the ALJ's finding that notwithstanding the limitations on the use of his left shoulder he could perform the physical requirements for the three jobs highlighted by VE Ennis. (Pl.'s Br., ECF No. 7, at 25-28). He argues that he could perform none of these jobs because the record evidence "illustrates that Plaintiff could never frequent[ly] reach in all directions because his shoulder is [hanging by ligaments and muscles and] not even in the socket." (*Id.* at 25). According to Plaintiff, the ALJ's finding that Plaintiff can frequently lift 10 pounds and reach in all directions with his left arm is not supported by any medical evidence in the record and therefore is merely the ALJ's

own lay judgment crafted without any expert input related to his physical condition. (*Id.*). Plaintiff offers three options that the ALJ could have taken, instead of relying on her own lay medical judgment: 1) order a physical consultative examination; 2) arrange for a medical expert to testify at the hearing; or 3) send the case back to the state agency for a physical opinion. (*Id.* at 26). Having done none of these things, the ALJ necessarily erred in providing her own medical opinion, posits Plaintiff. (*Id.* at 26-27).

In addition, Plaintiff contends that the ALJ's finding that his left shoulder dislocations constituted a severe MDI inherently contradicted the concurrent finding that he can still frequently lift 10 pounds and reach in all directions. (*Id.* at 26). Plaintiff notes that "frequent" under the regulations equates to the ability to perform an activity for up to two-thirds of the workday. (*Id.* (citing SSR 83-14, 1983 WL 31254 (Jan. 1, 1983); SSR 83-10, 1983 WL 31251 (Jan. 1, 1983))). According to Plaintiff, an individual cannot possess the ability to frequently perform these activities and also have a severe MDI. (*Id.*)

Relatedly, Plaintiff also argues that "the ALJ failed to reconcile contradictory testimony from the VEs" regarding whether the restriction prohibiting contact with other employees was work-preclusive. (*Id.* at 28). Plaintiff argues that this case must be remanded in order for the ALJ to "clarify this discrepancy." (*Id.*).

The Commissioner responds that the record evidence was sufficient to support the ALJ's findings as to the functionality of Plaintiff's left shoulder. (Resp., ECF No. 8, at 13). The Commissioner points to the record evidence indicating that: 1) when Plaintiff presented to the emergency room with the dislocations, medical personnel were able to reduce his shoulder, and he was informed that he required no further treatment; and 2) on examination, he had full strength and range of motion and was neurovascularly intact. (*Id.* (citing R. 18-21)). Moreover, notwithstanding this evidence, the ALJ accommodated the risk of dislocation and Plaintiff's pain

by assessing a limitation to light work with no more than frequent reaching overhead and in all directions. (*Id.* (citing R. 18-21, 23)). Ultimately, the Commissioner argues that Plaintiff's contention that the record showed an inability to perform frequent lifting and reaching amounts to a mere disagreement with the ALJ's interpretation of the record evidence. (*Id.*).

Regarding the testimony of the two VEs, the Commissioner maintains that Plaintiff mischaracterizes VE Marmo's testimony. (*Id.* at 10-11 n.4). The Commissioner notes that VE Marmo did not actually opine that a no-contact limitation was work-preclusive, but that there was an "issue" with "no changes in a work setting" and "no contact with co-workers." (*Id.* (citing R. 70)). Additionally, the Commissioner argues that limitations restricting claimants to no contact with co-workers is an acceptable limitation that does not necessarily require a finding of disability. (*Id.*).

### 2. Analysis

I agree with the Commissioner that substantial evidence supports the ALJ's RFC determination regarding Plaintiff's left shoulder. To the extent Plaintiff argues that the record evidence demonstrated that he could not frequently utilize his left arm, that contention amounts to a mere disagreement with the ALJ's factual findings which does not justify reversal. *See* 20 C.F.R. § 404.1527(e)(1); *see also Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (noting that district courts are not "empowered to weigh the evidence or substitute [their] conclusions for those of the fact-finder") (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *Hilty*, 2019 WL 950334, at *4; *Izzo*, 186 F. App'x at 284; *Hartranft*, 181 F.3d at 360. Though Plaintiff has a history of dislocations in the shoulder, the record evidence shows that each time the shoulder was properly reduced with no additional lingering symptoms or need for further treatment. (R. 18 (citing R. 2452-58, 2463-2518, 2520-2632)). Moreover, the ALJ found that despite complaints of left shoulder pain, upon examination in April 2023, Plaintiff retained

full strength and range of motion and was neurovascularly intact. (*Id.* (citing R. 2452-58)). Therefore, the ALJ weighed the record evidence and ultimately found that Plaintiff was capable of light work with certain restrictions regarding his left arm. (*Id.*). *See* 20 C.F.R. § 404.1527(e)(1); *see also Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (noting that district courts are not "empowered to weigh the evidence or substitute [their] conclusions for those of the fact-finder") (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *Hilty*, 2019 WL 950334, at *4; *Izzo*, 186 F. App'x at 284; *Hartranft*, 181 F.3d at 360.

Likewise, Plaintiff's contention that there are no "physical opinions" in the record supporting the ALJ's RFC determination is of no moment. It is true that although it is the ALJ's sole responsibility to determine a claimant's RFC, this determination is usually made with an assessment from a physician regarding the functional abilities of the claimant. *Hartman v. Colvin*, No. 02:13–cv–00265–TFM, 2014 WL 1784084, at *7 (W.D. Pa. May 5, 2014) (citations omitted). That is because the ALJ is not permitted to draw "speculative inferences from the record or 'substitute [her] own judgment for that of a physician.' [Sh]e must have something upon which to ground [her] findings, and usually that something (or at least part of that something) is an opinion from an acceptable medical source." *Id.* (quoting *Biller v. Acting Comm'r of Soc. Sec.*, 962 F. Supp. 2d 761, 778-79 (W.D. Pa. July 24, 2013)). Where an ALJ rejects the opinions of medical professionals regarding the claimant's physical or mental condition, the ALJ must thereafter "point to some 'medical evidence speaking to [Plaintiff's] functional capabilities that supports [her own] conclusion' as to Plaintiff's RFC." *Id.* (quoting *Biller*, 962 F.Supp.2d at 778) (first alteration in original). Here, the ALJ did so, pointing to the medical notes from Plaintiff's various emergency department visits as well as the April 2023 examination finding that he had full strength and range of motion in his left upper extremity. (R. 18 (citing R. 2452-58, 2463-2518, 2520-2632)). Therefore, the ALJ provided "a clear and

satisfactory explication of the basis on which [her RFC assessment] rests." *See Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir.2001) (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).

Regarding Plaintiff's argument that a finding that his Hill-Sachs lesion was an MDI was inherently inconsistent with frequent shoulder usage, Plaintiff does not support this contention with any authority, and the Court has located none. He cites broadly to two policy rulings from the Commissioner, but neither stands for the proposition advanced. (*See* Pl.'s Br., ECF No. 7, at 26 (citing SSR 83-10, 1983 WL 31251; SSR 83-14, 1983 WL 31254)). SSR 83-10 pertains generally to a claimant's capability to do other work, and nowhere in the ruling is there any language indicating that an MDI finding is inconsistent with frequent usage of an extremity. Instead, the ruling clarifies the framework used by ALJs to make disability decisions and defines the different exertional capabilities (i.e., sedentary, light, medium, heavy and very heavy) used to articulate a claimant's RFC. *See generally* SSR 83-10, 1983 WL 31251. SSR 83-14 also pertains to a claimant's "capability to do other work" with a specific emphasis on how ALJs evaluate combinations of exertional and nonexertional impairments. Thus, the ruling likewise does not contain language indicating that an MDI finding is inconsistent with frequent usage of an extremity.

Plaintiff also cites to 20 C.F.R. § 416.921 for the proposition that a severe MDI by necessity must "significantly limit[] a claimant's ability to perform basic work activity." (*Id.* at 27). Read in context, Plaintiff's argument is that a restriction to frequent reaching and lifting is not a significant enough restriction to correspond with a finding of an MDI.

But that is not the law: a restriction to light work and to only "frequent" lifting and reaching is still a significant limitation. *See Lamb v. Colvin*, No. 12-137, 2013 WL 5366260, at *8-10 (W.D. Pa. Sep. 24, 2013) (affirming the ALJ's RFC determination finding that Plaintiff's

conditions caused "significant limitation[s]," including the ability to lift and carry up to ten

pounds "frequently").

Finally, regarding Plaintiff's argument that the ALJ failed to reconcile the two competing

VE opinions,[7] it is clear from the opinion that she credited VE Ennis's testimony over VE

Marmo's as she ultimately found that Plaintiff could perform the jobs identified by VE Ennis.

*See Lawrence v. Kijakazi*, No. 22-cv-4995, 2023 WL 7129950, at * 10 (E.D. Pa. Oct. 30, 2023)

("[A] reviewing court must be able 'to trace the path of an adjudicator's reasoning'") (quoting 82

Fed. Reg. 5844-01, at 5858); *see also Robert I. v. O'Malley*, No. 1:22-cv-1892, 2024 WL

3102224, at *14 (D.N.J. June 24, 2024) (the "ALJ's discussion must provide for 'meaningful

review' when 'read as a whole'") (quoting *Jones*, 364 F. 3d at 505); *Gross v. Comm'r of Soc.*

*Sec.*, 653 Fed. App'x 116, 120 (3d Cir. 2016) (the Act requires only that the agency's path "may

reasonably be discerned") (quoting *Christ the King Manor, Inc. v. Sec'y of Health & Hum.*

*Servs.*, 730 F.3d 291, 305 (3d Cir. 2013)); *Hartranft*, 181 F.3d at 360 (a district court is bound by

the factual findings of the Commissioner if they are supported by substantial evidence and

decided according to correct legal standards). Thus, there is no need to "reconcile" the testimony

from each, as the ALJ accepted one over the other.

Accordingly, I find that the ALJ did not err in determining that Plaintiff was capable of

performing light work with certain restrictions, notwithstanding the Hill-Sachs lesion in his left

shoulder.

---

[7] The Commissioner argues that the two opinions were not inconsistent with each other because VE Marmo never stated that an individual who could not deal with any changes in a routine work setting and who could have no interaction with co-workers or the general public would be precluded from competitive work, only that those limitations presented significant "issue[s]." (*See* Resp., ECF No. 8, at 10 n.4). The record belies the Commissioner's contention on this point, as VE Marmo clarified moments later that the limitations identified "would preclude the work." (R. 70).

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**.  An appropriate Order follows.


BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge